IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THE ESTATE OF EUGENE DONJUALL          )
GILLIAM, by and through his personal   )
representative, Cynthia Harmon Waldroup, )
Administratrix,                        )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )          CASE NO. 2:08-cv-278-MEF
                                       )
CITY OF PRATTVILLE, *et al.*,          )          (WO—Publish)
                                       )
          Defendants.                  )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Defendants Camille Emmanuel ("Emmanuel") and Brian Gentry ("Gentry") (collectively "the officers"), both police officers with the Prattville Police Department, used their tasers during a routine traffic stop to stun and immobilize Eugene Gilliam ("Gilliam"), who later died from heart failure.  Plaintiff Cynthia Harmon Waldroup ("Waldroup"), Gilliam's mother and the administrator of his estate, filed this lawsuit against the officers and their employer, the City of Prattville ("the City").  Waldroup seeks compensatory and punitive damages under 42 U.S.C. § 1983 and Alabama's wrongful death statute.

This cause is before the Court on the defendants' Motion for Summary Judgment (Doc. #44), filed on July 9, 2009.  For the reasons set out below, the Court concludes that the motion must be GRANTED in part and DENIED in part.  This cause is also before the

Court on the defendants' Motion to Exclude the Causation Testimony and Reports of Scott Bell, M.D. and James Lauridson, M.D. (Doc. #42), filed on July 9, 2009.  Because the Court's decision to grant this motion would exclude relevant evidence from the summary-judgment inquiry, the Court will take up the motion now.  For the reasons set out below, the Court concludes that the motion must be GRANTED in full.

## II.  JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental).  The parties do not contest personal jurisdiction or venue, and the Court finds a sufficient basis for each.

## III.  LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The moving party can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present any evidence in support

of an element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its initial burden, Rule 56(e) "requires the nonmoving party to go beyond its pleadings and by its own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On the other hand, the court ruling on a motion for summary judgment must believe the evidence of the nonmoving party and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## III. RELEVANT FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and opposition to the motion. Under the summary-judgment standard, the Court must view these submissions in the light most favorable to Waldroup, the nonmoving party. As the Eleventh Circuit has noted, "the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case."

*Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 925 n.3 (11th Cir. 2000). The submissions establish the following facts for the purpose of summary judgment:

On the evening of April 9, 2007, at about 5:15 p.m., Gilliam was driving in his car to a local gym to play pick-up basketball with a few friends. Gentry, on routine traffic-control duty and running radar from his police motorcycle, clocked Gilliam driving ten miles per hour above the posted speed limit. Gentry also noticed that Gilliam was not wearing his seat belt. He promptly turned on his lights, gave pursuit, and pulled over Gilliam's car.

After Gilliam pulled over and parked his car, Gentry approached it and observed Gilliam rummaging through the car and the glove box. When Gentry asked Gilliam to produce his drivers license and proof of insurance, Gilliam responded that he did not have either document with him. Instead, he provided to Gentry his social security number, a bill from an insurance company, and a tag receipt from 2006. Before returning to his motorcycle to run Gilliam's information, Gentry asked Gilliam if he had any drugs on him. Gilliam replied that he did not.[1] During this short conversation, Gilliam answered all of Gentry's questions fully and politely.

Gentry then returned to his motorcycle and asked Dispatch to run a license check

---

[1]According to the defendants, Gentry did not ask Gilliam if he had any drugs on him at this time. Additionally, Gentry told state investigators he had smelled marijuana through the open window of Gilliam's car. But the defendants do not assert this fact in their version of the facts, and since Waldroup does not assert it either, the Court will ignore it for purposes of summary judgment.

using the social security number Gilliam had given him.  Dispatch reported that the social

security number matched a valid drivers license belonging to either a "Eugene Gilliam" or

"Gene Gilliam," described on the license as six feet tall and 200 lbs.  This physical

description did not match Gentry's estimate of the actual size of the person in the car.[2]

Dispatch also told Gentry that Gilliam might be a probationer.  And while Gentry was

communicating with Dispatch, he witnessed Gilliam moving around in his car, seeming to

bend down and reach towards and into the floorboards.  Based on Gilliam's demeanor

and abnormal behavior, and the information Gentry had learned from Dispatch, Gentry

radioed for backup.

Emmanuel responded to Gentry's call for backup and parked her police car behind

Gilliam's car and Gentry's motorcycle.[3]  The two officers had a short conversation at

Gentry's motorcycle, in which Gentry reported to Emmanuel that Gilliam did not have

any identification on him and was moving around in the car.  Gentry remarked that

---

[2]At the first autopsy, Gilliam's body weighed 280 lbs.

[3]Emmanuel's police car's video camera captured images of the incident from this moment forward.  But the video does not appreciably aid the Court's decision making. Because of its framing, the video shows only the small part of the incident that happened within a few feet of the drivers-side door of Gilliam's car.  Even when Gilliam and the officers are within the frame, much of what they do is obscured because Emmanuel is standing in front of Gentry and Gilliam, and all three of them are standing behind Gentry's motorcycle.  Nor does the video record what Gilliam and the officers said during the incident.  Most importantly, the video does not show the officers' use of their tasers. In short, the video is not dispositive, and because Waldroup has made a plausible argument that the video supports her version of the facts, this Court will credit her take on the video as a justifiable inference.

something did not feel "right" about the situation and that he was going to ask Gilliam to get out of his car.  Both officers then approached Gilliam's car, and Gentry asked Gilliam to step out of the car.  Gilliam complied.  Gentry told Gilliam that he was going to conduct a "pat down" search of Gilliam for weapons and that Gilliam should face the car and place both of his hands on top of it.  Again, Gilliam complied.  Shortly thereafter, as Gentry was patting down Gilliam for weapons, Gilliam revealed to the officers that he had "three sacks of weed" on him.[4]

After Gilliam disclosed his possession of marijuana to the officers, Gentry grabbed hold of Gilliam's arm and twisted it behind Gilliam's back.  Gilliam cried out that Gentry was hurting his arm, and he pulled his arm forward from Gentry and placed it back on top of the car.  Gilliam did not move his other hand, which remained on top of the car, and he remained in compliance with Gentry's earlier verbal commands.[5]

Immediately after Gilliam pulled his arm forward from Gentry, Gentry shouted to

---

[4]According to the defendants, Gilliam did not volunteer this information.  Rather, the defendants allege that Gentry first felt something hard in Gilliam's pocket.  Thinking it might be a pocketknife, Gentry removed it and saw that it was only a wad of cash. Gentry had Gilliam hold the cash in his hand on top of the car while Gentry continued the pat-down search.  Then, after searching Gilliam's waistband and unrolling his trouser legs, Gentry felt a bulge on the inside of Gilliam's thigh and asked Gilliam what the bulge was.  Only then did Gilliam respond that he had three bags of marijuana on him.

[5]The defendants' version of the facts does not include any mention of Gentry twisting Gilliam's arm behind his back or of Gilliam pulling his arm forward.  In addition, Waldroup says in her complaint that Gilliam also may have taken a step forward toward the car when he pulled his arm forward, but this Court can find no basis for this assertion in the record.

Emmanuel, who was standing a few feet away, to use her taser on Gilliam. Emmanuel then shot her taser at Gilliam. When the taser probes hit Gilliam, he raised both of his hands off of the top of the car and collapsed to the ground a few feet away from the car. Gentry jumped on top of him and started kneeing him repeatedly. Both Gentry and Emmanuel then used their tasers on Gilliam multiple times, often simultaneously. In addition, Emmanuel used her taser in drive-stun mode, where the taser is applied without firing probes. At some point soon after the first tasering, Gentry told Emmanuel to "tase him again," to which Gilliam responded, "Y'all are trying to kill me." Gilliam did not struggle, fight back, throw any punches, or kick at the officers. Rather, he merely convulsed continuously on the ground for several minutes.[6]

When the officers eventually stopped using their tasers on Gilliam, Gentry had fired his taser sixteen times for a total of 1:29 minutes out of a period of 2:05 minutes, and Emmanuel had fired her taser eleven times for a total of 2:16 minutes out of a period

---

[6]The defendants dispute most of these facts. They claim that Gilliam, after admitting to the officers that he had marijuana, suddenly pushed off of the vehicle and began to run away. Gentry, who was still holding onto Gilliam's trousers, was dragged by Gilliam until both of them fell down some ten feet from Gilliam's car. After scuffling with Gentry on the ground, Gilliam got up and continued to alternatively run from and fight with the officers as they gave chase for about 150 feet. Gentry brought Gilliam to the ground at least three times during this pursuit, but each time Gilliam got back up and continued to flee. Eventually, the officers got Gilliam under control by using their tasers on him after he tripped and fell on a driveway. Gentry also kneed Gilliam several times and hit him on his legs with his police baton.

of 2:41 minutes.[7]

The officers dragged Gilliam out of the street and into a nearby yard, where they handcuffed him as he lay face down.[8]  Gentry radioed to report that Gilliam was in custody, and he requested medical attention for Gilliam at 5:28 p.m.[9]  Sometime before the paramedics arrived, Gilliam complained of chest pains and breathing difficulties.  The officers took off the handcuffs, rolled him over onto his back, and handcuffed him again across the front of his body.  When the paramedics arrived at 5:32 p.m., only four minutes after they had been called, Gilliam could not stand up, and the paramedics carried him to the ambulance on a stretcher.  Gilliam became unresponsive and his arm hung limp off the side of the stretcher.[10]  The ambulance left for Prattville Baptist Hospital at 5:56 p.m. and arrived at 5:58 p.m.

---

[7]According to the defendants, neither Emmanuel nor Gentry used their tasers as much as Waldroup claims.  Gentry says he used his taser only once for the normal firing time of five seconds.  Emmanuel says she used her taser three times, once in regular mode and twice more in drive-stun mode, all for the normal firing time of five seconds.  Also, she claims she also fired Gentry's taser once for the normal firing time of five seconds.

[8]In the defendants' version of the facts, the officers handcuffed Gilliam where he fell—on the driveway and not in the street.  Their version does not mention that either officer moved Gilliam from the driveway until the paramedics arrived.

[9]Prattville Police Department protocol requires that police officers call paramedics for assistance whenever an officer uses a taser on a suspect.  In addition, a police department supervisor must respond to the scene of the incident.

[10]The defendants' version of what happened does not indicate that Gilliam became unresponsive at this time.  The paramedics from Prattville Fire/EMS reported soon after the incident that Gilliam was "alert" and "coherent in speech" and had "normal skin and color," but that he also had "distressed breathing" and a "rapid pulse."

About seven hours later, at 12:26 a.m. on April 10, 2007, Gilliam died.  Later that day, the state medical examiner performed an autopsy on Gilliam's body and listed "hypertensive cardiovascular disease consistent with dysrhythmia" as the final pathological diagnosis.  He listed the cause of death as "hypertensive cardiovascular disease" and the manner of death as "natural."  Using blood drawn from Gilliam at 6:23 p.m. on April 9, 2009, a toxicology screen flagged Gilliam's blood as positive for marijuana and cocaine.

There is no evidence, and no party has claimed, that either the officers or any other employee of the City failed to follow the mandatory investigation procedures and reporting requirements after the incident.  As is required each time an officer uses a taser, both officers filled out use-of-force reports, which were reviewed by the police department.  Both officers were trained and certified to use a taser in June 2004.  At the time of this incident, the City did not require its officers to get additional taser training each year, and neither Emmanuel nor Gentry had received any training since 2004.  In 2008, the City adopted an official policy requiring annual training and re-certification for its officers on the use of their tasers.

## IV.  PROCEDURAL HISTORY

Waldroup filed this suit on April 9, 2009.  Waldroup makes two claims under 42 U.S.C. § 1983.  First, she claims that the officers used excessive force against Gilliam, thereby violating his constitutional right under the Fourth Amendment to be free from

unreasonable seizures.[11]  Second, she claims that the City caused this constitutional violation because it failed to adequately train or supervise its officers by not requiring that officers armed with a taser receive additional taser training and re-certification every year.

In addition to her federal claims under § 1983, Waldroup asserts that all three of the defendants are liable under Alabama law for the wrongful death of Gilliam under § 6-5-410, Code of Alabama (1975).  She asserts three theories of liability.  First, she alleges Gilliam died because of the officers' negligent and wanton misuse of their tasers during the traffic stop.  Second, she alleges Gilliam died because of the officers' failure to seek medical attention for Gilliam promptly after they used their tasers.  Third, she alleges Gilliam died because the City negligently trained and supervised its officers.

The defendants seek summary judgment.  On the § 1983 claims against the officers, the defendants argue Waldroup has not presented sufficient evidence showing an excessive use of force.  Also, the officers argue they are entitled to qualified immunity.  On the § 1983 claim against the City, the defendants argue Waldroup has not presented sufficient evidence showing that the City's failure to require annual training both

---

[11]In her original complaint, Waldroup brought claims under § 1983 for excessive force under only the Eighth and Fourteenth Amendments.  In her amended complaint, Waldroup added a claim for excessive force under the Fourth Amendment.  Now, in her response to the defendants' motion, Waldroup has conceded she has no basis upon which to bring a claim under either the Eighth Amendment or the Fourteenth Amendment's Due Process Clause.  Accordingly, this Court will grant summary judgment in favor of the defendants on these claims, and all that remains of Waldroup's case against the officers under § 1983 is an excessive-force claim under the Fourth Amendment.

constituted an official policy of the City and caused the underlying constitutional violation against Gilliam.

On the state-law claims, the defendants challenge the qualifications and reliability of Waldroup's two expert witnesses, without which Waldroup cannot prove the officers caused Gilliam's death. Second, the defendants argue Waldroup has not presented any evidence establishing the appropriate standard of care in the failure-to-seek-medical-attention claim. Lastly, the officers argue they are entitled to state-law discretionary immunity.

## V.  DISCUSSION

### A.  § 1983 Excessive-Force Claim

#### 1.  Qualified Immunity

In response to Waldroup's § 1983 excessive-force claim, the officers contend they are exempt from liability under the doctrine of qualified immunity. The Court disagrees.

Qualified immunity protects government officials acting within their discretionary authority from civil liability in § 1983 actions as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken."

*Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

To receive qualified immunity, an officer must first show he was acting within his discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). In this case, the parties do not dispute, and the Court agrees, that both officers were acting within their discretionary authority for qualified-immunity purposes. *See Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (holding that "it is clear" that an officer who used excessive force when arresting a suspect and transporting him to jail was acting within his discretionary authority); *Lee*, 284 F.3d at 1194 (holding that "there can be no doubt" that an officer who pulled over a suspect for a traffic offense and then arrested her with excessive force was acting within his discretionary authority).

Once an officer establishes he was acting within his discretionary authority, the burden then shifts to the plaintiff to show that qualified immunity does not apply. *Id.* Courts usually apply a two-step test when deciding whether qualified immunity is appropriate. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court must first determine whether the officer's conduct amounted to a constitutional violation. *Id.* Second, the court must decide whether the violated right was "clearly established" at the time it was violated.[12] *Id.* The intention of this second step is to "ensure that before they are

---

[12]In *Pearson v. Callahan*, the Supreme Court ruled that the two-step test established in *Saucier* is no longer mandatory; instead, courts may analyze whether the violated right was clearly established under *Saucier*'s step two before examining the

subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206. Therefore, if the violated right was not clearly established under contemporary law, qualified immunity still applies. *Id.* at 201.

## 2. Constitutional Violation

Under *Saucier*'s step one, this Court first examines whether the officers' conduct, especially their firing of the tasers, violated Gilliam's constitutional rights. The Court finds that it did.

"The Fourth Amendment's freedom from unreasonable searches or seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). When a plaintiff contends an officer used excessive force during an arrest or investigatory stop, the question for the court is whether the officer's conduct was objectively reasonable in light of the situation confronting the officer. *Graham*, 490 U.S. at 396–97. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8

---

potential constitutional violation under step one. *Pearson*, 129 S. Ct. 808, 818–21 (2009). But adherence to the two-step procedure is appropriate in this case because the Court finds that a constitutional right was violated and that it was clearly established at the time of its violation.

13

(1985)).

To balance the necessity of the use of force against the plaintiff's constitutional rights, a court must evaluate several factors, including "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Lee*, 284 F.3d at 1198 (quoting *Graham*, 490 U.S. at 396). In addition, the court must weigh: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted; and (4) whether the force was applied in good faith or maliciously and sadistically.[13] *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force . . . ." *Lee*, 284 F.3d at 1198. Accordingly, "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330.[14]

---

[13]The fourth factor, which looks at the subjective intent of the officer, is in conflict with the holding in *Graham* that the excessive-force inquiry is completely objective. In fact, a couple of panels of the Eleventh Circuit have unilaterally ruled that *Graham* "invalidated" or "eliminated" this factor from the excessive-force inquiry. *See Lee*, 284 F.3d at 1198 n.7. Nonetheless, another panel of the Eleventh Circuit recently applied all four factors without caveat. *Hadley*, 526 F.3d at 1329. The Eleventh Circuit has not yet struck this factor in an en banc decision, and as such, this Court believes that the factor, even if not relevant in this case, continues to be part of the Eleventh Circuit's test.

[14]In their motion for summary judgment, the defendants argue that the officers are entitled to qualified immunity because they had "arguable" probable cause to search, arrest, and therefore use force against Gilliam, even if they did not have "actual" probable

When these factors are applied to the facts of this case, which are viewed in the light most favorable to Waldroup, it is abundantly clear that Emmanuel and Gentry used force that was plainly excessive and grossly disproportionate.

First, when Emmanuel fired her taser for the first time, the officers had probable cause to believe Gilliam had committed two traffic offenses—speeding and driving without a seatbelt—and the unlawful possession of a small amount of marijuana. Generally, "more force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Lee*, 284 F.3d at 1198. None of these three crimes are very serious, nor does the fact that a suspect has committed one or all of them indicate that the suspect is more likely to threaten or assault an arresting officer. They are not the sort of offenses that would evince to a reasonable officer the need to use more force than

_____

cause to do so. They cite to three cases to support their position: *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003); *Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999).

But these cases and the rule of law they stand for are irrelevant in this case. All three cases discuss the distinction between arguable and actual probable cause in the context of § 1983 claims for false arrest, and the excessive-force inquiry mandated by *Graham* is markedly different from the inquiry in other Fourth Amendment contexts. In fact, the very concept of probable cause, much less the distinction between arguable and actual probable cause, is pertinent in the excessive-force context *only* if a suspect argues that *any* use of force, even if de minimis, is constitutionally excessive because the officer who used that force had *no* probable cause to search or arrest a suspect.

Because Waldroup makes an excessive-force claim and not an illegal-search or false-arrest claim, and because this Court, based on its assessment of the *Graham* factors, finds that the amount of force used by the officers was excessive regardless of whether probable cause existed, the distinction between arguable and actual probable cause is beside the point.

normal to subdue the suspected offender.

Second, under Waldroup's version of the facts, Gilliam did not pose a threat to the officers' safety. He answered Gentry's questions fully and politely, and did not use abusive or threatening language. He complied with Gentry's verbal commands, even after Gentry twisted his arm behind his back with no warning or explanation. And he did not punch or kick at the officers, even in self-defense. Moreover, the officers, both of whom were armed, outnumbered Gilliam two to one.[15]

Third, Gilliam was not actively resisting or evading arrest under Waldroup's version of the facts. When Emmanuel fired her taser at Gilliam for the first time, Gilliam was still standing with his hands on top of the car, and he did not attempt to flee during the time the officers used force on him. In addition, Gilliam's response when Gentry twisted his arm behind his back—to pull his arm forward and away from Gentry in pain, and to place it back on top of the car—cannot be described as "actively resisting" arrest. In fact, the record does not show that the officers ever told Gilliam he was under arrest or not complying with their orders.

Fourth, even though there is no evidence the officers used their tasers maliciously or sadistically, the officers applied that force arbitrarily and unnecessarily. On the facts here, the officers did not need to resort to their tasers immediately. Rather, they could

---

[15]The record does not indicate that Gilliam was armed. In addition, the officers have not claimed that they thought or suspected that Gilliam possessed a weapon at the time Emmanuel fired her taser for the first time.

have first warned Gilliam that he was not complying with their orders or told him that he was under arrest.

Fifth, and most important in this case, the amount of force used against Gilliam was unreasonably disproportionate to the need for force.  There are few situations where it would be reasonable for police officers to apply two tasers simultaneously against a single person for twenty-seven firings over more than two minutes.  This is not one of them.  Even if the Court were to assume that the officers' initial resort to a taser was necessary because Gilliam was actively resisting arrest when he pulled his arm away from Gentry, the officers still were not justified in continue to taser him for two minutes even though he was either not fighting back or convulsing on the ground.

The defendants rely on two Eleventh Circuit cases to support their position that the taser use in this case was not excessive force.  *See Zivojinovich v. Barner*, 525 F.3d 1059 (11th Cir. 2008); *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004).  But this Court does not believe that either case is on point.  Both cases stand for the proposition that a police officer is entitled to use a taser for a short period of time to subdue a suspect who is belligerent, hostile, or uncooperative, and therefore potentially a threat to the safety of the officer or others. *Zivojinovich*, 525 F.3d at 1073; *Draper*, 369 F.3d at 1278.  The measured use of a taser in these "difficult, tense, and uncertain" situations, especially when the physical injuries that result are comparatively slight, is reasonably proportionate to the need for force and is not excessive. *Zivojinovich*, 525 F.3d at 1073; *Draper*, 369

17

F.3d at 1278.  This proposition, however, is inapposite to the facts of this case.  Unlike the plaintiffs in *Zivojinovich* and *Draper*, Gilliam did not threaten Emmanuel or Gentry, act belligerently towards them, or ignore their instructions.  In fact, he fully complied with all of their verbal commands.  And in spite of his cooperation, the officer used substantially more force—over two minutes of near-continuous tasering—leading to a greater physical injury—death—than did the officers in *Zivojinovich* and *Draper*, both of whom only used their tasers for a short period of time with little-to-no injury to their respective suspects.  Thus, Emmanuel and Gentry's conduct does not fall within the protection afforded by these two cases.

Because the *Graham* factors weigh so heavily in favor of Gilliam, the Court concludes that the facts of this case, when viewed in the light most favorable to Waldroup, show that the officers' use of their tasers constituted excessive force in violation of Gilliam's Fourth Amendment rights for qualified-immunity purposes.[16]

### 3.  "Clearly Established" Law

Under *Saucier*'s step two, this Court next examines whether the constitutional

---

[16]The defendants also make a related argument that summary judgment is appropriate on this § 1983 excessive-force claim because Waldroup has not presented sufficient evidence to create a genuine issue of material fact that the officers violated Gilliam's rights.  The Court disagrees.  Just as this Court has found a constitutional violation for qualified-immunity purposes, so too could a reasonable jury find that, based on the same record and the same reasons, the officers violated Gilliam's Fourth Amendment rights.  Therefore, the Court will deny the motion for summary judgment to the extent it relies on this argument.

right violated by the officers was clearly established at the time of its violation.  The Court finds that it was.

A constitutional right is clearly established for qualified-immunity purposes in one of three ways: (1) case law with indistinguishable facts that clearly establishes the right; (2) a broad statement of principle in the Constitution, a statute, or case law sufficient to provide notice that clearly establishes the right, even for cases arising out of factually different situations; or (3) conduct so egregious as to clearly violate a right on its face, even in the total absence of case law.  *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1292 (11th Cir. 2009).

To fall within the third category, in which officers are presumed to have fair warning of the clear establishment of a right because of the egregiousness of the conduct in question, a court must inquire into whether the officers' conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Lee*, 284 F.3d at 1199.  Therefore, Waldroup must show that Emmanuel and Gentry's conduct was "so far beyond the hazy border between excessive and acceptable force" that the officers must have known they were violating the Constitution without case law on point. *Smith v. Maddox*, 127 F.3d 1416, 1419 (11th Cir. 1997).  This test entails determining whether the application of the excessive-force standard would inevitably lead every objectively reasonable officer in Emmanuel and Gentry's position to conclude that the

force applied was unlawful.  *Priester*, 208 F.3d 919, 926 (11th Cir. 2000).

In this case, the Court does not accept that any reasonable officer could believe that Emmanuel and Gentry's conduct was lawful.  Simply put, the amount of force used by the officers in this case was so unreasonably disproportionate to the need for force that the conduct is unconstitutional on its face.  Even though Gentry possessed the lawful authority to pull over Gilliam's car, conduct a pat-down weapons search, and effect a valid custodial arrest, no reasonable officer could believe that Gentry also had the lawful authority to taser Gilliam, an obedient and nonthreatening suspect, twenty-seven times in two minutes.  Such force does not serve a legitimate law-enforcement purpose, and it is precisely the kind of police brutality that lies at the very core of what the Fourth Amendment prohibits.

The Eleventh Circuit has ruled in factually indistinguishable cases that this kind of police conduct is indeed so egregious as to clearly violate the Fourth Amendment on its face.  *See Priester*, 208 F.3d at 926–27 (finding an egregious violation of the Fourth Amendment and denying qualified immunity to an officer who allowed his police dog to attack a passive suspect who had followed the officer's order to lie down on the ground after attempting to flee); *Smith*, 127 F.3d at 1419 (finding an egregious violation of the Fourth Amendment and denying qualified immunity to an officer who broke a suspect's arm even though the suspect had "docilely submitted" to the officer's order to "get down").  Therefore, not only is this conduct a clearly established constitutional violation

20

under the third category, but this case law clearly establishes the constitutional right in question under the first category as well.

Because this Court finds that every reasonable officer would conclude that the conduct of which Waldroup complains is unconstitutional, and because this finding clearly falls within Eleventh Circuit precedent, this Court must deny qualified immunity. Therefore, the Court will deny the motion for summary judgment to the extent it is predicated on this basis.

### B.  § 1983 Failure-to-Train Claim

In response to Waldoup's § 1983 failure-to-train claim, the City argues Waldoup has failed to present sufficient evidence showing that the City's allegedly inadequate training and supervision of its officers constituted an official policy or custom of the City and caused the violation of Gilliam's constitutional rights.  The Court agrees.

A municipality is not liable for the constitutional torts of its police officers under a theory of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a plaintiff seeking to hold a municipality accountable under § 1983 must establish that the municipality adopted an official policy or custom that caused the constitutional violation.  *Id.* at 694–95.  Therefore, a municipality is not automatically liable under § 1983 even if it inadequately trained or supervised its officers and those officers violated another person's constitutional rights.  Indeed, when asserting inadequate training or supervision as the basis for liability, the plaintiff must show that: (1) the municipality

failed to adequately train or supervise its officers; (2) this failure was part of an official policy or custom of failing to adequately train or supervise; and (3) the failure caused the officers to violate a person's constitutional rights. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389–91 (1989)).

Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its police officers, a plaintiff may prove a municipal policy or custom by showing that the municipality's failure to adequately train or supervise evidences a "deliberate indifference to the rights of persons with whom the police come in contact." *Gold*, 151 F.3d at 1350 (quoting *Canton*, 489 U.S. at 387). A plaintiff seeking to establish a municipality's deliberate indifference "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* This knowledge requirement is "intentionally onerous" for plaintiffs because to require less would be to allow a municipality to be held liable solely on the basis of respondeat superior. *Id.* at 1350 n.10.

The Eleventh Circuit has determined that the knowledge requirement is satisfied in only two circumstances. First, a plaintiff must prove that the municipality was aware of a pattern of similar constitutional violations in the past. *Lewis*, 561 F.3d at 1293. Alternatively, a municipality is presumed to have knowledge, even without evidence of

prior incidents, if the plaintiff shows that the likelihood for constitutional violation was so high as to make the need for training or supervision obvious.  *Id.*

Here, Waldroup has not presented any evidence of a pattern of similar constitutional violations in the past, but instead explicitly relies on the argument that the City's failure to require taser training and re-certification for its officers each year falls under the alternative method of proving knowledge, the "obvious need" test.[17]  Thus, Waldroup asks the Court to apply a test that is almost impossible to meet.  To date, the Supreme Court, in dictum, has given only one example of a need to train being "so obvious" that a municipality could be liable without a pattern of constitutional violations: the use of deadly force where firearms are provided to officers.  *Canton*, 489 U.S. at 390.  Since then, the Supreme Court has characterized these comments as "simply hypothesiz[ing]" in a "narrow range of circumstances" where a constitutional violation might be a highly predictable consequence of the failure to train.  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 398 (1997).  Also, the Eleventh Circuit has consistently refused to extend the logic of this hypothetical example to other situations involving archetypal law-enforcement activities where municipalities have failed to provide any training.  *See Lewis*, 561 F.3d at 1293 (finding no obvious need to train officers on the application of a

---

[17]In her complaint, Waldroup alluded to one prior incident of excessive force, a case involving a complainant named Kelly Harris.  But the record does not include any evidence about this incident, and Waldroup's response to the defendants' motion relies solely on the "obvious need" test and does not even mention that Waldroup might prove her case in any other manner.

"hobble" restraint); *Gold*, 151 F.3d at 1352 (finding no obvious need to train officers on how to respond to handcuff complaints from suspects); *Young v. City of Augusta*, 59 F.3d 1150, 1171–72 (11th Cir. 1995) (finding no obvious need to train jail employees "to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed").  This case law holds that an "obvious need" claim must be based on a "particularly glaring omission in a training regimen" and not merely on "possible imperfections" in that regimen.  *Gold*, 151 F.3d at 1352.

The City's failure to re-train its officers on the use of their tasers every year is not a "particularly glaring omission" because the use of a taser is distinguishable from the use of a firearm in the Supreme Court's sole hypothetical example.  The use of a firearm against a person is presumptively the use of deadly force, while the use of a taser is not presumptively the use of deadly force.  Indeed, tasers are marketed by their manufacturer and purchased for use by police departments precisely because they are a nonlethal alternative to firearms.  In this respect, tasers are more similar to police batons than firearms: although a rogue police officer might unreasonably apply a taser with deadly force, when used properly by a reasonable police officer, a taser is designed to avoid death and not cause it.

Moreover, this is not a case where the City provided no training at all.  Instead, both Emmanuel and Gentry were fully trained and certified to use their tasers in 2004, having taken an intensive eight-hour course covering the history, mechanics, and use of

the taser, including safety and legal issues associated with its use.  The course included

practical exercises and scenario-based training to make sure the officers were able to

deploy and fire their tasers safely.  Afterwards, both officers passed written and practical

examinations.  Given the nature of this training, which conformed with City policy, and

with no evidence in the record showing it was not sufficient, the Court finds that

Waldroup has proved nothing more than "possible imperfections" in the City's training

program.

Thus, because Waldroup has not presented sufficient evidence to create a genuine

issue of material fact on the City's deliberate indifference, Waldroup cannot establish that

the failure to train was part of an official policy of the City.

Even if Waldroup had presented sufficient evidence showing that the City's failure

to train was an official policy, summary judgment would be appropriate nonetheless

because Waldroup has not presented any evidence showing that the deficiency in training

actually caused the officers' use of excessive force.  In *City of Canton v. Harris*, the

Supreme Court emphasized the need for a close causal link between the identified

deficiency in the training program and the underlying constitutional violation, and it

advised courts to ask whether the injury could "have been avoided had the employee been

trained under a program that was not deficient in the identified respect."  489 U.S. at 391.

But Waldroup has not presented any evidence that the officers used their tasers on

Gilliam because they did not know how to use their tasers, did not understand the law of

excessive force as it relates to tasers, or had any other deficit that could have been

remedied by more training.  Consequently, Waldroup has failed to show a genuine issue

of material fact on the causation element of the failure-to-train claim as well, and the City

is entitled to summary judgment on two grounds.[18]

### C.  State-Law Wrongful-Death Claims

### 1.  The *Daubert* Standard

The defendants argue the Court should exclude the reports and testimony of two of

Waldroup's expert witnesses, Dr. James Lauridson ("Lauridson") and Dr. Scott Bell

("Bell").  The Court agrees.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

---

[18]The defendants also argue they are entitled to summary judgment on Waldroup's
§ 1983 claims because state law either precludes or substantially limits Waldroup's
potential recovery of damages.  The first argument, which would prevent recovery against
the City, is moot because this Court will grant summary judgment to the City on all of the
claims against it.  The second argument, which involves a general cap on damages, is not
an appropriate issue for summary judgment because it involves only a partial limitation on
recovery and does not affect any claim in full.  Therefore, the Court will deny the portion
of the defendants' motion for summary judgment based on these arguments.

Fed. R. Evid. 702.  As the Supreme Court made clear in *Daubert*, Rule 702 compels the district court to perform a "gatekeeping" function concerning the admissibility of expert testimony to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 589 n.7.  "The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in the factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

According to the Eleventh Circuit, expert testimony is only admissible under Rule 702 if it satisfies three broad requirements:

> (1) the expert witness is qualified to testify competently about the matters he intends to address; (2) the methodology used by the expert to reach his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony is relevant in that is assists the trier of fact, through the application of scientific, technical, or specializes expertise, to understand the evidence and to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1999).  The proponent of the expert testimony bears the burden of satisfying the requirements of Rule 702 by a preponderance of the evidence and thereby proving its admissibility.  *Id.* at 1260.

The first test under Rule 702 is whether the witness offering the expert testimony is qualified to do so.  There is no bright-line rule for determining whether a given witness is qualified to offer expert testimony.  Rather, the decision is inherently case specific and therefore lies within this Court's discretion.  Nevertheless, Rule 702 does offer a basic

27

framework for evaluating a witness's qualification by providing that expertise must be established by one or more of the following bases: knowledge, skill, experience, training, and education.

The second test under Rule 702 is whether the expert testimony offered is reliable. When evaluating the reliability of scientific or medical expert testimony, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592−93.

To evaluate the reliability of a scientific expert opinion, a court considers several factors: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the known or potential rate of error of the methodology is acceptable; and (4) whether the theory is generally accepted in the proper scientific community. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593−94). These factors are illustrative, not exhaustive, and a court should "consider any additional factors that may advance its Rule 702 analysis." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). These additional factors may include whether the expert developed his opinion expressly for the purposes of testifying, unjustifiably extrapolated from an accepted premise to an unfounded conclusion, failed to rule out other possible causes or adequately account for obvious alternative explanations, or relied on insufficient facts, anecdotal evidence, or

mere temporal proximity.  Fed. R. Evid. 702 advisory committee's note (2000).

Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes

these other questions may be more useful.  As a result, "the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable."  *Kumho Tire*, 526 U.S. at 152.

## 2.  Dr. James Lauridson

Lauridson, a Certified Forensic Pathologist, performed a second autopsy on

Gilliam's body.  Based on that procedure, Lauridson will testify to the following opinion:

> "It is my opinion that based on the chronology of events, the collapse
> leading to the death of Mr. Eugene Gilliam was initiated by the police arrest
> and restraint."

According to his deposition testimony, Lauridson will not testify about the actual cause of

Gilliam's death because the second autopsy did not yield enough information for

Lauridson to be able to make this assessment at an acceptable level of confidence.

Lauridson also affirmatively stated at his deposition that he will not and cannot testify to

any link between Gilliam's heart failure and the use of the tasers by the officers.  Instead,

Lauridson's opinion is based solely on the temporal proximity of the incident to Gilliam's

death, some seven hours after the police used their tasers on him.

As to Lauridson's qualifications, this is an easy case.  The Court does not have any

doubts about his qualifications to testify as an expert witness.  Lauridson is familiar with

toxicology, cardiology, and substance abuse, which are all fields of medicine that are

relevant in establishing Gilliam's cause of death.  He understands these fields in the context of his career as a forensic pathologist, where it has been his job for decades to pinpoint the cause and manner of death.  In addition, he has performed hundreds of autopsies and has testified on cause-of-death issues in more than 200 cases as an expert witness.  This is overwhelming evidence in favor of his qualifications to be an expert.

The defendants argue Lauridson is not qualified because he admits that he does not have specific knowledge about the effect of a taser on the human body and has not performed an autopsy where excessive taser use might have been the cause of death.  This argument is not persuasive.  First, Lauridson is familiar with methods of police restraint and their effects on the human body; such issues arise regularly in both the literature of forensic pathology and the day-to-day job of a forensic pathologist.  Second, Lauridson does not need to be completely proficient in every sub-specialty of forensic pathology to be qualified to testify.  He is sufficiently trained in his field of expertise, a specialty in and of itself, and has enough experience in that field to be able to speak meaningfully to the jury about cause-of-death and manner-of-death issues across a whole range of fact-specific situations.

Even though Lauridson is qualified to testify as an expert witness, the Court finds that his testimony in this particular case is not admissible because it does not meet the requirements of *Daubert*.  The Court recognizes that Lauridson's opinion does not use the word "cause" and that he admitted at his deposition that he cannot state within a

reasonable degree of medical certainty that any single action by the officers was the catalyst or medical cause of Gilliam's death.  Nonetheless, Lauridson clearly does intend to testify that the officers' use of force was the "but for" cause of Gilliam's death in the sense that whatever ultimately killed Gilliam was set off by the officers' use of force.

Lauridson's only rationale for this opinion is the temporal proximity of the incident to Gilliam's death.  Therefore, his opinion is hard for the Court to assess under the *Daubert* factors because it does not proceed from a conclusion produced by a scientific methodology accepted by the Eleventh Circuit.  It is merely the product of the argument that what happens first must have caused what happened second.  This Court will not admit expert testimony that seeks to show that the existence of a temporal relationship between the use of excessive force and Gilliam's death is sufficient to prove a causal relationship between those two events, especially when there is a seven-hour gap between them and the testimony does not take into account Gilliam's prior drug use, preexisting conditions, or subsequent medical procedures.  Simply put, correlation is not causation, and as the Eleventh Circuit has held, the *post hoc ergo propter hoc* fallacy is not reliable enough to be allowed as expert testimony.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005).  Therefore, the Court finds that despite Lauridson's qualifications, his opinion testimony is not reliable enough to be admitted.  The Court will exclude his report and testimony.

### 3.  Dr. Scott Bell

Bell, a physician with a general practice in internal medicine, seeks to testify that Gilliam's cardiac arrest was a result of the use of the tasers.  His report states:

> "After review of the medical and autopsy record you have provided, I determine that Mr. Gilliam died as a result of cardiac failure brought on by immobilization and restrain with the use of the taser device.  Restraint by physical force may also be a factor, but there is no data available for me to make that determination.  The mechanism for cardiac failure in this case is likely catecholamine-induced myocardial damage."

Bell explained in his deposition testimony that Gilliam's death was most likely caused by "stress cardiomyopathy."  In other words, Gilliam "was under psychological stress which results in the release of catecholamines which has toxic effects on cardiac muscles which resulted in him presenting to the hospital in cardiopulmonary arrest and dying shortly afterwards."  When asked to identify what physical stress Gilliam was under, Bell asserted that it was police restraint with the use of the taser.

The Court finds that Bell is not qualified to testify as an expert witness.  Bell is not board certified in cardiology, toxicology, psychology, substance abuse, electro-physiology, or forensic pathology—all subjects that come to bear in this case and in Bell's particular theory of the case.  Rather, Bell's training and experience is in seeing patients in the clinical setting of his practice.  But Bell has not provided any evidence that his clinical work has given him any knowledge about any of these fields of medicine beyond the knowledge that comes with a medical degree.  Second, Bell has not published any articles or conducted any studies regarding any topic closely related to any subject matter

32

remotely related to his testimony.  Third, Bell admitted at his deposition that he has no

knowledge of tasers or other police-restraint methods.  Fourth, Bell has never been

qualified to testify as an expert witness on any issue in any other case before this one.  In

short, Waldroup has not presented any evidence showing that Bell had any expertise in

the medical fields about which he is proposing to testify before he was called to be a

witness in this case.

Therefore, Bell's sole argument for his qualifications are that as a licensed medical

physician and a general practitioner, he is nonetheless qualified to testify about most, if

not all, medical issues, even without any other indicia of specialization.  A court must

inquire into whether a proposed expert witness's qualifications correspond to the subject

matter of his proffered testimony.  In other words, a witness qualified as an expert in one

subject may not offer expert testimony on another subject.  But this is complicated when a

proposed expert witness has only general knowledge in a field.  Courts are split on

whether to admit the testimony of this type of witness.  For example, some courts have

concluded that general knowledge in a field is sufficient to qualify a witness as an expert

in that field's specialities as well, and that a general practitioner can offer expert

testimony concerning medical conditions routinely treated by specialists.[19]  In these cases,

the courts hold that a witness's lack of specialization goes only to the weight of the

---

[19] *See, e.g.*, *Payton v., Abbott Labs.*, 780 F.2d 147, 155 (1st Cir. 1985) (holding that
two board-certified obstetrician–gynecologists were qualified to offer expert testimony in
teratology, the study of abnormal development).

witness's testimony and does not disqualify the witness. But other courts have disagreed and have held that generalists may not testify on specialty areas when their lack of expertise in those areas would mean that they could not assist the trier of fact.[20] This Court can find no Eleventh Circuit decision that gives any meaningful guidance.

In practice, this means that the matter is within this Court's discretion as it looks to the specific facts of this case. Qualifications are relative, being more or less useful depending on the expert's familiarity with the subjects that are relevant to the matter to be decided by the trier of fact. Therefore, qualifications must not be evaluated in the abstract. Rather, the Court's gatekeeping obligation requires that the Court evaluate qualifications in light of what is necessary to explain a particular subject matter to the jury. Compared to Lauridson, who is specialized in a field of medicine relevant to the causation inquiry, Bell is not specialized in any field relevant to this inquiry. And Waldroup has not made any showing to this Court that Bell has the experience necessary to give him the expertise in these relevant subject areas. The Court will not accept Waldroup's assertion that Bell "knows more than a layperson" in these relevant fields without some kind of proof beyond Bell's license to practice medicine.

It is true that Bell admitted at his deposition that he was not qualified to testify

---

[20] *See, e.g.*, *Chikovsky v. Ortho Pharm. Corp.*, 832 F. Supp. 341 344−46 (S. D. Fla. 1993) (holding that a board-certified obstetrician−gynecologist was *not* qualified to offer expert testimony that the topical application of Retin-A causes birth defects because the physician had no demonstrated expertise in embryology, teratology, or genetics).

about the effects of a taser on the human heart muscle.[21]  Nonetheless, the Court does not believe that this statement is relevant to the inquiry into Bell's qualifications in this case because his theory of Gilliam's death is not that the electric current from the taser caused cardiac arrest.  Rather, his theory is that the officers' use of force, including their use of the tasers, caused Gilliam to be under stress, which in turn caused a stress-induced heart attack.  Therefore, the defendants are not correct when they argue Bell is disqualified of his own admission.

Nevertheless, the Court does find that Bell's comment at his deposition undercuts the argument that, by virtue of his medical degree and generic medical experience, Bell is qualified to testify to the more specific medical-causation issues in this case.  If he is admittedly not qualified as a generalist to testify about the effect of taser's electric currents on the heart, then it is not clear without other evidence supporting his qualifications why he is qualified as a generalist to testify about the stress and psychological effects of the taser on the heart.  The onus is on Waldroup to explain the difference, and she has failed to do so.

Even if Bell were qualified to testify as an expert, his testimony would not be reliable.  First, Bell relied on incomplete and insufficient data in the formulation of his opinion.  He admitted at his deposition that he did not have access to or examine either of

---

[21]Bell said: "I'm not going to testify what a taser can do to the cardiac muscle and how it gets to the cardiac muscle.  That's not my expertise, and I'll agree with that."

the two autopsies performed on Gilliam's body, and he has not reported what amount of catecholamines, if any, were present in Gilliam's blood.  Second, Bell has not supported his catecholamine theory either in the abstract or specifically in this case.  Bell has not explained the mechanism by which an increased catecholamine release causes cardiac arrest, nor has he provided data or scholarly support to validate this mechanism.  He has provided no evidence of baseline catecholamine levels, no explanation of whether the amount of catecholamines in Gilliam's blood was sufficiently different from those baseline levels to cause cardiac arrest, and no information regarding what various factors and activities could cause catecholamine-induced cardiac failure.  In addition, Bell has failed to explain how a taser device or any other method of police restraint causes an increase in catecholamine levels in the first place.  Third, Bell has not offered any evidence that any of the other possible explanations for Gilliam's death, such as substance abuse, genetic traits, obesity, and past cardiac problems, did not effect the catecholamines in Gilliam's blood or contribute to causing Gilliam's death.  Specifically, Bell has not provided any data that explains what effect cocaine and marijuana has on catecholamine levels.

In short, Bell's testimony draws speculative conclusions from insufficient data. Bell does not describe the method he used to reach his conclusion and fails to provide scientific data supporting his conclusion.  To permit Bell to take the stand would do nothing more than confuse the jury.  The Court will exclude his report and testimony.

### 4. Summary Judgment

Under Alabama's wrongful death statute, Waldroup must prove as a part of her prima facie case that the defendants' actions were the actual and proximate cause of the injuries alleged. *Dibiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 460 (Ala. 2008). Medical causation is a technical and scientific issue that requires the specialized knowledge of an expert medical witness. *Wingster v. Head*, 318 F. App'x 809, 815–16 (11th Cir. 2009). Without expert medical testimony, Waldroup cannot show that a genuine issue of material fact exists as to the cause of Gilliam's death. *See id.* (granting summary judgment because, without expert medical testimony, mere temporal proximity alone does not refute specific medical evidence that a person died from natural causes). Because this Court has excluded all of Waldroup's expert witnesses on the issue of causation, no genuine issue of material fact exists with regards to causation, and the defendants are entitled to summary judgment on the state-law wrongful-death claims.[22]

---

[22] In addition to the argument that Waldroup failed to show that the officers' actions caused Gilliam's death—which is dispositive in this case—the defendants also seek summary judgment on two other grounds. First, Gentry and Emmanuel assert they are entitled to state-law discretionary immunity. Second, the defendants argue Waldroup has failed to present sufficient evidence to establish the standard of care that should be applied to Waldroup's allegation that Gilliam died because the officers failed to transport Gilliam to the hospital promptly following the incident. But having already disposed of all the state-law claims on federal-law grounds, this Court is reluctant to interpret Alabama law without reason to do so. Rather, in the interests of federalism, this Court will bypass those arguments.

## VI.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED:

1.      The defendants' Motion to Exclude the Causation Testimony and Reports of Scott Bell, M.D. and James Lauridson, M.D. (Doc. 42) is GRANTED.

2.      The defendants' Motion for Summary Judgment (Doc. #44) as to the claims under 42 U.S.C. § 1983 against Emmanuel and Gentry for excessive force in violation of the Fourth Amendment is DENIED.

3.      The defendants' Motion for Summary Judgment (Doc. #44) as to all other claims is GRANTED and those claims are to be DISMISSED.  The Clerk of the Court is DIRECTED to terminate the City of Prattville as a party.

DONE this the 26th day of October, 2009.


                                    /s/ Mark E. Fuller
                        _____
                        CHIEF UNITED STATES DISTRICT JUDGE